UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DEARCO HILL,

                        Petitioner,                    **DECISION AND ORDER**

      -vs-                                   No. 01-CV-6280

DANIEL A. SENKOWSKI,

                         Respondent.
_____

## INTRODUCTION

Petitioner, Dearco Hill ("Hill"), filed this *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction in Monroe County Court on felony murder and robbery charges. The parties have consented to disposition of this matter by the undersigned pursuant to 28 U.S.C. § 636(b).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Michael Weeks was shot to death on December 31, 1992, at a motel where he was staying with his wife.  Hill was arrested as he fled from the scene of the crime in his car. After his apprehension, a gold chain belonging to the victim was found on his person.  Hill gave a statement to police claiming that he was merely an innocent bystander to the shooting but admitting that he had picked up the chain.  A Monroe County Grand Jury indicted Hill on charges of intentional murder, felony murder, and first degree robbery.  Hill was tried before a jury in Monroe County Court (Egan, J.).  A summary of the relevant trial testimony follows.

The victim's widow, Elaine Weeks ("Mrs. Weeks"), testified for the People that she had

traveled to Rochester from New York City to visit her estranged husband, Michael Weeks ("Weeks"), for the purpose of reconciling with him, and that they had booked a room at the Motel 6 in the Town of Gates, New York.  According to Mrs. Weeks, she traveled to Toronto with her brother to visit her children; she claimed that her husband did not accompany her on this trip because he did not have his green card.  Mrs. Weeks testified that she returned to Rochester on New Year's Eve in order to attend a concert with her husband and her brother.

Mrs. Weeks testified that she borrowed an iron from another guest at the Motel 6 that evening so that she could iron an outfit to wear to the concert.  Some time later, the woman from whom she had borrowed the iron appeared at her door along with two men, one of whom was wearing a gold outfit; the other, a beige patchwork outfit.  Mrs. Weeks returned the iron to the woman, and the three individuals departed.  Weeks commented to her that the two men were the same individuals with which he had had an argument earlier that afternoon, and she replied that it was a "small world."  *See* T.306-10.[1]

Mrs. Weeks then went into the bathroom to take a shower.  Several moments later, she heard a man cursing at her husband.  Mrs. Weeks emerged from the bathroom to see four men (including the man in gold and the man in patchwork)  pushing her husband into the room. T.310-11.  Mrs. Weeks identified Hill as the man in the gold outfit, and said that he standing by the foot of the bed.  T.320.  Weeks was flanked by a man in denim and a man in the metallic-green suit in between the bed and the wall.  T.321-22.  The fourth man, who was wearing a beige patchwork outfit, was wiping the door handle with a towel.  T.323.  During this time, the man in denim and the man in green were "roughing [Weeks] up" and "arguing real terrible [sic] back

---

[1] Citations to "T.__" refer to the trial transcript.

and forth." T.325.  Both of these men had guns.  T.327.

Weeks asked the men, "'Why you had to act like that?  You're acting as if you don't know me.  Why you want to disrespect me this way in front of my wife?'" T.328.  The argument continued to escalate, and the man in denim threatened to shoot Mrs. Weeks if she did not stop shouting at them.  Weeks said, "'Please leave my wife out of it,'" and the man in denim struck him in the face with the pistol.  T.329.  The man in denim and the man in metallic-green pulled Weeks' rings off his fingers and yanked a gold chain from around his neck.   At this point, Mrs. Weeks said, the man in gold (*i.e.*, Hill) left the room for a "[m]inute or two." T.332-33.

When Hill returned to the room, he walked over to where Weeks and the man in denim and the man in green were standing and looked as if he was about to "embrace" Weeks. T.335-36, 342.  The man in denim said, "'Is it done?  Is everything out [sic] the room?'" T.341.  Hill replied, "'Yes,'" and the two other men "step[ped] aside." T.335-36, 341.  Hill "walked up towards [Weeks] and reach[ed] his arm around him." T.342.  It was at this point that Mrs. Weeks heard a single shot, T.338, but she did not see Hill shoot her husband, T.448.  She then ran out into the hallway and down the stairs.  *Id.*

Mrs. Weeks testified that Hill did not have anything in his hands, nor had she seen him with a gun earlier.  T.337.  However, she noticed that when he returned to the room, there was a "puffed" bulge in his front waistband underneath his gold sweater which appeared to her to be a gun.  T.338.  Mrs. Weeks admitted on cross-examination that she did not know whether Hill in fact had a gun under his sweater.  T.447.  She testified that the man in denim and the man in metallic-green were holding their guns by their sides.  The fourth man in the beige patchwork suit was still standing by the door when her husband was shot.  T.339.

On cross-examination, Mrs. Weeks was questioned about her participation in narcotics trafficking. She denied that she and her husband were involved in the distribution of illegal drugs in the Buffalo area.  T.415, 421.  She denied that the incident in which her husband was killed had anything to do with drugs.  T.413.  Mrs. Weeks admitted that she was arrested on April 15, 1990, for possession of cocaine and pled guilty to a misdemeanor.  T.418-19.  She maintained that she had never seen any of the four men who attacked her husband prior to the evening of December 31, 1992.

Upon his apprehension, Hill gave a statement to the authorities which was introduced into evidence at trial. T.1132-34. In this statement, Hill claimed that he had gone to the Motel 6 to find a girl he had met at a club the night before.  Hill told the police that he witnessed the altercation which culminated in Weeks' shooting from across the hall.  He said that he saw Weeks' gold chain being thrown on the floor and had stepped into the room quickly and grabbed it.

Hill's testimony at trial, however, differed from the version of events that he gave to the police. He testified that after going shopping with his girlfriend at a boutique on New Year's Eve, he went to visit his brother, Michael Hill, who had come to Rochester to go to a reggae concert and had checked into the Gates Motel 6.  He indicated that he was wearing a gold outfit that night and that he did not have a gun.  T.1261, 1277.  Soon thereafter, When Hill arrived at the room, he saw his brother, along with several men and a woman.  Hill indicated that everyone was drinking and arguing about drugs.  T.1265.  Hill testified that the argument paused when he arrived and that his brother introduced him to the others in the room—Mr. and Mrs. Weeks, and his brother's friend, Charley.  T.1264.  Hill testified that he never had met any of these people

before.  *Id.*

During the argument, Hill heard Mrs. Weeks say to his brother, "'Look, we have sell [*sic*]
you marijuana before over the past years and we haven't [had] a problem.  I'll take care of
whatever little problem we have.'" T.1265-66.  Hill testified that he paid no attention to the
argument and, at his brother's suggestion, went next door to talk to some girls for about five
minutes.  T.1266.  At that point, he overheard Weeks say, "'I'll give you back some of the
money, or I'll get you the rest of marijuana.'" *Id.*   Hill testified that the argument continued for
about ten or fifteen minutes and then stopped.  T.1269.  Hill indicated that he then returned to his
brother's room where he took some photographs of his brother and had a brief conversation with
him.  *Id.*

Hill heard the argument start up again, and there was more door slamming and cursing.
At that point, he decided to go tell his brother that he was leaving the motel, but his brother was
not in his room.  T.1273.  Hill saw that his brother was in the room across the hall, and that Mrs.
Weeks was standing at the door.  Weeks was in the room, along with Mrs. Weeks' brother,
Charley, and a man later identified as Jeffrey Tobias ("Tobias").  T.1275.  Hill testified that he
went into the room, and that he heard Mrs. Weeks say, "'Stop or somebody [is] going to get
hurt.'" T.1274.  Weeks then said, "'Hold this, I'll get you the rest of the money back.  I'll get you
the rest of the marijuana.'" T.1276.

At that point, Hill saw Charley "toss something behind him." *Id.*  It was a gold chain, and
Hill stepped into the room and picked it up.  T.1277.  Hill then told his brother, "'Look[,] this has
been going on ever since I got here.  I'm ready.  Let's go, I'm ready to leave.'" *Id.*  Hill tstified
that he stepped in between Weeks and his brother to "try to separate them" and told his brother,

"Look[,] let's go.  This ain't worth it.  I'm not here seeing [*sic*] you all fighting.'"  T.1278.  At

that point, Weeks pushed him out of the way, pulled out a gun and started to "rassle" with his

brother.  *Id.*  Hill testified that he "was on the bed, gun was tossing the air, wheeling."  T.1279.

His brother's friend, Charley, also had a gun.

Hill said that he was "scared of getting shot" and that "everybody ran."  *Id.*  He testified

that he heard two shots fired after he was out of the room and down the hall.  T.1280.  Hill

testified that he ran outside, got into his car and started backing out of the parking lot, whereupon

Tobias jumped into the car, pointed a gun at him and told him to drive. T.1283.  Hill testified that

he pushed the gun away and asked Tobias not to point the gun at him.  T.1283.

When Hill was finally apprehended, the police found two guns on the passenger side of

the car, neither of which was the murder weapon and both of which Hill denied knowing

anything about. The police also found a gold chain in the police cruiser, which Hill admitted at

trial that he deliberately dropped there, stating that he did not want to have anything to do with

what happened at the motel.  Hill testified that he did not tell the police what really had happened

at the motel because he was "scared" since Tobias had "threatened [him] with a gun, telling

[him] not to say anything."  T.1286.  Also, Hill claimed that one of the officers kept telling him

that he knew Hill had killed Weeks and that Hill was going to be charged with murder.  *Id.*

On October 29, 1993, the jury returned a verdict acquitting Hill of intentional murder, but

finding him guilty of robbery and felony murder.  Defense counsel moved pursuant to New York

Criminal Procedure Law ("C.P.L.") § 330.30 to set aside the verdict on the ground that he was

not provided with certain *Rosario*[2] material.  *See* Appendix O to Respondent's Answer at 134–36

---

[2] *People v. Rosario*, 9 N.Y.2d 286, 290 (1961).

(Docket # 4).  Defense counsel also argued that the trial court improperly instructed the jury on the intent required to support a robbery conviction.  *See id.* at 136-37.  The trial court denied summarily denied the motion from the bench after oral argument.

Hill was sentenced on November 29, 1993 to twenty-five years to life on the felony murder conviction and eight and one-third to twenty-five years on the robbery conviction, these sentences to be served concurrently.  His conviction was unanimously affirmed by the Appellate Division, Fourth Department, of New York State Supreme Court on November 12, 1999.  *People v. Hill*, 266 A.D.2d 929 (App. Div. 4th Dept. 1999).  The New York Court of Appeals denied leave to appeal on February 25, 2000.  *People v. Hill*, 94 N.Y.2d 903 (N.Y. 2000).

This federal habeas petition followed. For the reasons set forth below, the petition is denied.

## DISCUSSION

### Timeliness

Respondent asserts that Hill's petition is untimely and must be dismissed.  Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which became effective on April 24, 1996, Hill had one year from the date on which his judgment of conviction became final to file his habeas petition. 28 U.S.C. § 2244(d)(1)(A); *Aparicio v. Artuz*, 269 F.3d 78, 89 (2d Cir. 2001). Keeping in mind that 2000 was a leap year, his ninety-day time limit to apply for a writ of *certiorari* to the United States Supreme Court elapsed on May 25, 2000, at which point the one year limitations period began to run.  *See Williams v. Artuz*, 237 F.3d 147, 151 (2d Cir.) (where petitioner appeals conviction to highest state court but fails to file for writ of *certiorari* to U.S. Supreme Court, petitioner's time under AEDPA's one-year statute of limitations begins to run at

expiration of ninety-day period during which petitioner may file petition for writ of *certiorari*),

*cert. denied*, 534 U.S. 924 (2001) .  Hill's habeas petition thus was due on May 25, 2001.

Documentation submitted by Hill to this Court indicates that he relinquished his habeas

petition to prison officials on May 13, 2001, the same day on which he signed it.  *See* State of

New York Department of Correction Services Disbursement or Refund Request (in file but not

docketed) dated May 13, 2001 and Petition (Docket #1) at 7.  Generally, when a petitioner is

proceeding *pro se*, the "mailbox rule" applies, and the date of filing is determined from the date

certified by the petitioner that the completed and signed petition was given to prison officials for

mailing.  *Houston v. Lack*, 487 U.S. 266, 270-71 (1988); *accord*, *e.g.*, *Noble v. Kelly*, 246 F.3d

93, 97 (2d Cir.) ("We conclude that the district court properly extended the prison mailbox rule

to petitions for writs of habeas corpus."), *cert. denied*, 534 U.S. 886 (2001).  Therefore, in this

case, Hill's petition is deemed filed as of May 13, 2001, and is timely under the statute.

## **Standard of Review**

Because Hill's petition post-dates the enactment of AEDPA, the Court is required to

apply the deferential standard of review prescribed by that statute.  AEDPA provides in relevant

part that

> [a]n application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  The Supreme Court has interpreted 28 U.S.C. § 2254(d)(1) as giving

independent meaning to both the "contrary to" and "unreasonable application" clauses. *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000). A state court decision is "contrary to" Supreme Court precedent if it (1) arrives at a conclusion that contradicts that reached by the Supreme Court on a question of law; or (2) confronts facts that are materially indistinguishable from those of relevant Supreme Court precedent and arrives at a contrary result. *Id.* at 405. A decision is an "unreasonable application" of clearly established Supreme Court law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* at 413.

**Merits of the Petition**

  **1.  Erroneous jury instruction concerning intent**

  As his first ground for habeas relief, Hill asserts that he was denied his right to a fair trial when the court refused to instruct the jury that in order to find him guilty of robbery as an accomplice, it had find to that Hill shared the principal's "intent both to steal and to use force to accomplish that goal."  Petition (Docket #1) at 5. At trial, defense counsel argued that if Hill did not share the intent that force be used to steal property, then he was not guilty of robbery or, by extension, felony murder.  T.1553.  Hill argues that the judge's charge created the risk that the jury would find that Hill intentionally stole Weeks' gold chain when he scooped it up from the floor, which is petit larceny, but then would find him guilty of robbery merely because others in the room used force. Hill raised this argument on direct appeal, and the Fourth Department summarily rejected it without comment.

  At trial, the court charged the jury that it could find that Hill acted either as a principal or an accomplice in committing first degree robbery or felony murder.  The court stated in relevant

part as follows:

> When I read to you the elements of those counts [*i.e.*, the robbery and felony murder counts]  I will not be referring to Section 20.00 [the accomplice liability statute] but I do remind you – I'm going to refer to it now.  I'll do it once and it will apply through the rest of my charge. . . . Under Section 20.00 you will see that [the People] do not necessarily allege that the defendant was the one who fired the shot.  So I'll start at the top.
> . . .
> Section 20.00 of the penal law provides as follows: When one person engages in conduct which constitutes an offense, another person is criminally liable for such conduct, *when acting with the mental culpability required for the commission thereof*, he solicits, requests, commands, importunes or intentionally aids such person to engage in such conduct.  Therefore, because of Section 20.00 of the penal law, a defendant may be convicted even though he did not physically commit such a crime, or some of the acts constituting such crime, and even though such crime or some of the acts constituting such a crime were committed by another person, or persons.
>
> Thus, under the law, it is not essential to a conviction that a defendant must have participated in each and every one of the acts necessary to constitute a crime if he was acting in concert with another, or others, charged or uncharged, who individually and personally committed the crime or some of the acts constituting such a crime.
>
> A person is guilty of a crime if he directly commits the act amounting to the crime, or aids or abets in its commission.  It does not matter whether he was present or absent, if he directly or indirectly commands or induces or procures or helps the other to commit the crime.  It also makes no difference that one of the participants played a relatively unimportant part while others were more active and performed more important parts in the commission of the crime.  Under those circumstances the act of one is the act of the other, and all are responsible for each others [*sic*] acts and for the consequences.
>
> However, in order for a defendant to be held accountable for a crime committed by another, or whether some of the acts constituting such a crime was [*sic*] committed by another, it is necessary that the defendant willfully associated himself in some way with the criminal venture.  Mere physical presence, standing alone, is not enough.  He must either participate in the criminal venture, assist in the criminal venture or perform some act to make it succeed.  Participation is with the required mental culpability when the act is done voluntarily, purposefully and with the intent to bring about some result which the law forbids.

T.1724-26 (emphasis added).  In the context of the felony murder charge, as to which the

underlying felony was the robbery, the trial judge stated that

> robbery is forcible, intentional stealing.  According to the law[,] a person forcibly
> and intentionally steals property when in the course of committing a larceny he
> uses or threatens the immediate use of physical force upon another person for the
> purpose of preventing or overcoming resistance to the taking of the property, or to
> the retention thereof immediately after the taking, or compelling the owner of
> such property or another person to deliver up the property, or to engage in other
> conduct which aids in the commission of the larceny.

T.1727.  The court explained that Hill "must have formed the intent to rob Weeks before death

occurred." T.1729.  The trial judge set forth the elements of robbery again, reminding the jury

that Section 20.00 applied even though he did not read it again in full.  He explained that "[a]

person is guilty of robbery in the first degree when he forcibly steals property, and when in the

course of the commission of the crime or immediate flight therefrom he or another participant in

the crime is armed with a deadly weapon."  T.1731.  The trial judge then defined what it means

to "forcibly steal" property using the same language that he used when defining robbery in the

felony murder section of the charge.  *Compare* T.1732-33 *with* T.1727.  Finally, the court

instructed the jury on the lesser included offense of petit larceny.  *See* T.1734-35.

In order to prevail on this claim, Hill must show that the jury charge  was erroneous and

that the error rendered the state court judgement constitutionally invalid. To demonstrate "that an

erroneous [jury] instruction was so prejudicial that it will support a collateral attack on the

constitutional validity of a state court judgment," a petitioner must show that "'the ailing

instruction by itself so infected the entire trial that the resulting conviction violates due process . .

. .'" *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141,

147 (1973)); *see also United States v. Frady*, 456 U.S. 152, 169 (1982); *accord United States v.*

*Doyle*,130 F.3d 523, 535 (2d Cir. 1997); *DelValle v. Armstrong*, 306 F.3d 1197, 1200-01 (2d Cir.

2002).  Upon consideration of the trial court's charge in its entirety, I do not find that it deprived

Hill of a fundamentally fair trial.  Taken as a whole, the charge adequately conveyed to the jury

the relevant principles of accomplice liability and robbery. The charge stated that the state was

required to prove that Hill participated in the criminal venture with the required mental

culpability and that robbery requires the use or threatened use of force.  I find that the charge

sufficiently instructed the jury that if it found that Hill had not participated in the robbery but

simply had picked the gold chain up off the floor after he happened to walk in on the crime as it

was being committed, it could not convict him of felony murder or first degree robbery, either as

accomplice or principal.  Thus, the Appellate Division's rejection of this claim was neither

"contrary to," nor an "unreasonable application of," governing Supreme Court precedent.

**2.      Destruction of *Brady* material**

Hill argues that the "police destroyed *Brady*[3] material," thereby denying him a fair trial.

Petition at 5 (Docket #1).  Hill points to the fact that Investigator Harnishfeger of the Gates

Police Department destroyed the notes he took during his interview of Hill and later admitted that

he probably did not transfer everything in the notes to his written police report.  At trial, defense

counsel moved for a mistrial, which was denied.  As a sanction for the police officer's actions,

the trial court issued an adverse inference charge, which defense counsel asserted was

insufficient.

Respondent asserts that this claim is unexhausted and procedurally barred from review

because it was not raised on direct appeal.  The law is clear that a petitioner must exhaust all

---

[3] *Brady v. Maryland*, 373 U.S. 83 (1963).

available state remedies either on direct appeal or through a collateral attack of his conviction

before he may seek a writ of habeas corpus in federal court.  28 U.S.C. § 2254(b); *Bossett v.*

*Walker*, 41 F.3d 825, 828 (2d Cir. 1994), *cert. denied*, 514 U.S. 1054 (1995).  The exhaustion of

state remedies requirement means that the petitioner must have presented his constitutional claim

to the highest state court from which a decision can be obtained.  *See Morgan v. Bennett*, 204

F.3d 360, 369 (2d Cir. 2000) (citing *Grey v. Hoke*, 933 F.2d 117, 119 (2d Cir. 1991)). A claim is

properly exhausted when the state court is fairly apprised of the claim's federal nature and of the

factual and legal premises underlying the claim. *Grey*, 933 F.2d at 119-20.

On direct appeal, Hill framed his *Brady* argument only as an alleged violation of the

prosecutor's obligation under *People v. Rosario*, 94 N.Y.2d at 290, to disclose all statements of

witnesses, regardless of whether they are favorable to the accused.  Importantly, he did not assert

that the prosecution violated its requirements under *Brady v. Maryland* to disclose material

evidence that is exculpatory or impeaching.  *See Strickler v. Greene*, 527 U.S. 263, 281-82

(1999) ("There are three components of a true *Brady* violation: (1) The evidence at issue must be

favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that

evidence must have been suppressed by the State, either willfully or inadvertently; and (3)

prejudice must have ensued."). The Court has reviewed Hill's appellate brief and found no

argument that any of the allegedly withheld documents were exculpatory or had impeachment

value, let alone that they were material to his conviction.

Most important, Hill's *Rosario* claim does not present an error of constitutional

magnitude and therefore is not cognizable on habeas review.  *Lyon v. Senkowski*, 109 F. Supp.2d

125, 139 (W.D.N.Y. 2000);  *Sutherland v. Walker*, 1999 WL 1140870, at *9 (S.D.N.Y. Dec. 10,

1999).  Unlike a *Brady* claim, a *Rosario* claim is solely a New York state law right.  *Lyon,* 109 F. Supp.2d at 139; *see also Copes v. Schriver*, 1997 WL 659096, at *4 (S.D.N.Y. Oct. 22, 1997) (*Rosario* violation does not establish a constitutional violation).  *Rosario* expanded the requirements later defined in *Brady* and its progeny, holding that the prosecution must disclose any prior statement of its witness, regardless of whether it is favorable to the accused.  *Lyon,* 109 F. Supp.2d at 139.  To the extent that it exceeds federal constitutional requirements, *Rosario* defines state law, and the prosecutor's failure to turn over *Rosario* material is not cognizable on federal habeas review.  *Id.*; *see also Green v. Artuz*, 990 F. Supp. 267, 274 (S.D.N.Y. 1998) (*citing United States ex. rel. Butler v. Schubin*, 376 F. Supp. 1241, 1247 (S.D.N.Y. 1974)).  Thus, Hill's couching of this *Brady* claim as a *Rosario* violation was not sufficient to fairly present it to the state courts.  Consequently, it remains unexhausted.

It is clear, however, that Hill has no remaining avenues through which to exhaust this claim in state court.  First of all, he is procedurally barred from raising the claim before the New York Court of Appeals because he has already made the one request for leave to appeal to which he is entitled.  *See* New York Court Rules § 500.10(a). Secondly, collateral review of his *Brady* claim via a C.P.L. § 440.10 motion is unavailable because the claim is a matter of the trial record and could have been raised on direct review.  *See* N.Y. Crim. Proc. Law §§ 440.10(2)(a), 440.10(2)(c) (barring review if claim could have been raised on direct review).  Accordingly, this procedurally defaulted claim is "deemed exhausted."  *See Grey v. Hoke*, 933 F.2d at 120-21.

Federal habeas review is only possible if Hill "can show cause for the default and prejudice attributable thereto," or demonstrate that failure to consider the federal claim will result in a "fundamental miscarriage of justice."  *Murray v. Carrier*, 477 U.S. 478, 485, 495 (1986)

(internal quotations omitted) (citation omitted); *accord*, *e.g.*, *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990).  Hill did not allege cause or prejudice in his petition, and I find neither present on the record before me.  Furthermore, Hill has not made a colorable showing of actual innocence so as to warrant invocation of the "miscarriage of justice" exception. *See McCleskey v. Zant*, 499 U.S. 467, 495 (1991).  Consequently, Hill cannot overcome the state procedural default and his *Brady* claim is barred from habeas review.

3.      **Failure to disclose witness's "non-identification" of suspect**

As his third basis for habeas relief, Hill contends that "the prosecutor failed to turn over *Brady* material until after trial."  This alleged *Brady* material consists of a police report summarizing Mrs. Weeks' inability to identify an individual named Willie Williams (who was not even a suspect in the murder) from a photo array.  Hill argues that this "non-identification," combined with Mrs. Weeks' statement that she could not identify the fourth assailant in the motel room that night, was of potential impeachment value.  *See* Petition at 6 (Docket #1).

Defense counsel raised this argument at the trial court level before Hill's conviction became final by including it as a basis for motion to set aside the verdict pursuant to C.P.L. § 330.30.  However, Hill did not raise it on direct appeal or as part of a motion to vacate the judgment pursuant to C.P.L. § 440.10.  In other words, Hill never sought to have his actual conviction overturned on the basis of this purported *Brady* violation. Because Hill has failed to fairly present the claim to the relevant state courts, it therefore is unexhausted.

Nevertheless, this claim is "deemed exhausted" because it is procedurally barred due to Hill's inability to return to the state courts in order to have it adjudicated.  *See* New York Court Rules § 500.10(a); N.Y. Crim. Proc. Law §§ 440.10(2)(a), 440.10(2)(c).  Cause and prejudice to

excuse the procedural default is lacking on this record, and there has been no showing of actual

innocence.  *See Murray v. Carrier*, 477 U.S. at 485; *McCleskey v. Zant*, 499 U.S. at 495.  For

these reasons, the claim is procedurally barred from habeas review by this Court.

> **4.      Erroneous introduction of evidence**

Finally, Hill contends that the court erred in allowing the prosecutor "to bring out that the

two guns recovered from petitioner's car were loaded in such a manner as to promote lethality."

Petition at 6 (Docket #1).  According to Hill, this unduly prejudiced him because neither gun was

the murder weapon," and therefore their manner of loading was irrelevant.  *Id.*  Hill raised this

issue on direct appeal, and the state court summarily dismissed it as "without merit."

Federal habeas corpus relief does not lie for alleged errors of state constitutional,

statutory, or procedural law unless a federal constitutional issue is also presented. *See Estelle v.*

*McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court "is limited to deciding whether a

conviction violated the Constitution, laws, or treaties of the United States;" it is not the province

of a federal habeas court to reexamine state court determinations of state law).  Thus, I am

limited on habeas review to considering whether the challenged ruling was an error of

constitutional magnitude.  Stated another way, Hill must demonstrate that the error deprived him

of a fundamentally fair trial in order to prevail.  *Rosario v. Kuhlman*, 839 F.2d 918, 924 (2d Cir.

1988) (citing *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973)).

At trial, the ballistics expert testified concerning the manner in which two guns found in

Hill's car had been loaded.  Although neither gun was used to shoot Weeks, both were found

immediately after the murder in the car in which Hill and co-defendant Tobias were attempting to

flee. The ballistics expert testified that the guns seized from Hill's car were loaded in an

alternating sequence of hard point and hollow point bullets.  T.1044-45, T.969-70.

Defense counsel did not object until the ballistics expert was asked what the purpose of such a loading method would be. T.1045-46.  In response, the prosecutor pointed out that the medical examiner had indicated that the victim's wounds appeared to be different in nature and that a possible explanation for this was alternating types of bullet rounds.  Moreover, he argued, since the guns were found in Hill's car, the similarities between their manner of loading and that of the murder weapon were relevant.  Finally, the prosecutor argued that the method of loading was relevant and probative on the issue of the intent of the person possessing the weapon. T.1048-50.  The trial court agreed with the prosecutor and overruled the objection. The expert then testified briefly that the purpose of "the alternate method of loading the magazine . . . would be to make that gun readily available to confront any situations you might run into." T.1050.  He explained that a fully jacked bullet has much greater penetrating power as compared to a hollow point bullet.  T.1051.

In light of the testimony at trial and the circumstances surrounding the shooting, I cannot find that the trial court abused its discretion in admitting evidence concerning the function of the magazine loading of the guns found in Hill's car, although its relevance is somewhat tenuous.[4] Even if the trial court did commit error in the admission of this evidence, it would not be one of constitutional magnitude. This claim accordingly is dismissed.

_____

[4]The medical examiner indicated that the victim's wounds appeared to be different in nature and that a *possible* explanation for this was alternating types of bullet rounds. The prosecutor's argument that since the guns were found in Hill's car, the similarities between their manner of loading and that of the murder weapon were relevant, was based on this *possibility*. Finally, the prosecutor argued, I believe mistakenly, that the method of loading was relevant and probative on the issue of the intent of the person possessing the weapons which were conceded to be unconnected to the crime. Thus, I believe the relevance of Hill's possession of these weapons in connecting him to the crime is arguably tenuous.

## CONCLUSION

For the reasons stated above, Dearco Hill's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed.  Because Hill has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253.

**IT IS SO ORDERED**

/s/ *Victor E. Bianchini*

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:         January 20, 2006
               Rochester, New York.